**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **N. SUGUMARAN NARAYANAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  7:21-cv-00046-O** |
| | § | |
| **MIDWESTERN STATE UNIVERSITY,** | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION & ORDER**

Before the Court are Defendant Midwestern State University's Motion for Summary Judgment (ECF Nos. 19–21), filed June 20, 2022; Plaintiff's Response (ECF Nos. 24–25), filed July 15, 2022; and Defendant's Reply (ECF No. 27), filed July 29, 2022. For the reasons stated below, the Court **GRANTS** Defendant's Motion in its entirety.

**I.     Background**

Plaintiff Dr. N. Sugumaran Narayanan became employed as an Assistant Professor by Defendant Midwestern State University on September 1, 2007.[1] He was granted tenure in 2013 and was promoted from Assistant Professor to Associate Professor in September 2015.[2] Plaintiff held the title of Associate Professor until the time of his termination in May 2020.[3]

In 2016, Plaintiff filed suit against Defendant for denial of a promotion based on retaliation as well as race, color, and national origin.[4] This lawsuit was settled.[5] Based on perceived retaliation for filing the 2016 lawsuit, in January of 2019, Plaintiff filed another charge against Defendant

---

[1] Am. Compl. ¶ 13, ECF No. 11.
[2] *Id.*; Def. Mot. 5, ECF No. 20.
[3] Am. Compl. ¶ 13, ECF No. 11.
[4] *Id.* at ¶ 14.
[5] Def.'s Br. 5, ECF No. 20.

with the EEOC based on retaliation and continued discrimination based on race, color, and national origin.[6]

Starting in 2017–2018, Plaintiff began to experience stress-related health issues – anxiety and hypertension.[7] Plaintiff requested and was granted leave to tend to these health issues.[8] Once he recovered, Plaintiff requested to teach summer classes for the summer 2018 session but was denied the opportunity.[9]

On September 6, 2018, Plaintiff requested a two-year leave of absence, to begin in Spring 2019.[10] He provided little explanation in his request, writing: "I am seeking to apply for a two-year leave of absence (without compensation), for good cause, beginning the Spring semester of 2019."[11] Defendant denied Plaintiff's request due to the hardship it would impose on the Political Science Department, which was short-staffed at the time.[12] Plaintiff took extended leave anyway. On November 28, 2018, Plaintiff requested expedited advanced funding for travel to Kuala Lampur, Malaysia, to present a paper at a conference in December 2018.[13] It was on this trip that Plaintiff was diagnosed with cervical spondylotic myelopathy.[14] According to Plaintiff's Amended Complaint, cervical spondylotic myelopathy is a neck condition that arises when the spinal cord becomes compressed due to wear-and-tear changes that occur in the spine as one ages.[15] In January

---

[6] Am. Compl. ¶ 14, ECF No. 11; Pl. Resp. 41, ECF No. 25. The parties do not disclose the outcome or status of the January 2019 lawsuit.
[7] Am. Compl. ¶ 15, ECF No. 11.
[8] *Id.*
[9] *Id.* at ¶ 16.
[10] Def.'s App. 182, ECF No. 21.
[11] *Id.*
[12] *Id.* at 181.
[13] *Id.* at 120–21.
[14] Pl.'s App. 98, ECF No. 25-1.
[15] Am. Compl. ¶ 19, ECF No. 11.

2019, Plaintiff told Defendant his Malaysian doctor told him that flying long distance could be extremely hazardous to his health.[16]

On January 8, 2019, just before the start of the Spring semester, Plaintiff submitted a two-page "Documentation of Disability" form from his Malaysian doctor saying that he "cannot fly," and giving the time frame of "at least six months" before he could resume his job functions.[17] At that time, Defendant "had no choice but to cancel the classes [Plaintiff was] scheduled to teach for the Spring 2019 semester."[18] On January 16, 2019, Defendant granted Plaintiff 341 additional hours of paid leave from Defendant's Sick Leave Pool, as Plaintiff had already exhausted all of his allotted paid sick leave at that point.[19] In total, Defendant granted Plaintiff the maximum lifetime sick leave pool benefit of 720 hours of paid leave.[20] Defendant allowed Plaintiff to continue on unpaid leave after the 341 additional hours were exhausted beginning on March 28, 2019.[21]

### A. Plaintiff Requests Additional Leave of Absence

On January 16, 2019, Defendant informed Plaintiff that he would receive teaching assignments for Fall 2019.[22] On May 13, 2019, Defendant notified Plaintiff of his teaching assignments for Fall 2019, and wrote: "If for any reason you will not be returning to teach, please notify [Defendant] as soon as possible."[23] On August 12, 2019, one week before the start of the fall semester, Plaintiff emailed Debra Higginbotham, Defendant's Director of Disability Support Services, and attached to that email a completed Request for Accommodation and Documentation

---

[16] Def.'s App. 66–67, ECF No. 21.
[17] *Id.* at 175–76.
[18] *Id.* at 150.
[19] *Id.* at 177.
[20] *Id.*
[21] *Id.* at 123.
[22] *Id.* at 150.
[23] *Id.* at 151.

Review form.[24] In this form, Plaintiff listed his disability and stated he is "unable to fly, especially long distances, therefore unable to return to work."[25] On the form, Plaintiff further stated "standing or sitting long time not possible," and requested "at least 6 months leave, possibly 12 months."[26]

Ms. Higginbotham responded to Plaintiff on August 20, 2019, attaching to her email an Employee Individual Accommodation Plan.[27] In this Plan, Ms. Higginbotham acknowledged Plaintiff's disability and offered the following recommendations for accommodation: "Chair available in classroom when teaching. May need ergonomic furniture in office. Limits on extended travel."[28] Plaintiff responded on August 21, 2019, requesting that the Individual Accommodation Plan reflect his inability to travel for at least another six months.[29] In her response on August 28, 2019, Ms. Higginbotham changed the Individual Accommodation Plan to recommend "[l]eave time unless such accommodation would have undue hardship on the functioning of the department or university."[30] Plaintiff never signed or returned this proposed Accommodation Plan.[31] On August 29, 2019, Plaintiff responded to Ms. Higginbotham's email asking her to remove the phrase "unless such accommodation would have undue hardship on the functioning of the department or university" from the Plan.[32]

That same day, August 29, 2019, Defendant's Director of Human Resources, Dawn Fisher, emailed Plaintiff that Defendant could offer the following accommodations: "Chair available in classroom when teaching," "Ergonomic furniture in office," and "Limits on extended University

---

[24] *Id.* at 125.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 126.
[28] *Id.*
[29] *Id.* at 126–27.
[30] *Id.* at 129.
[31] *Id.*
[32] *See id.* at 130.

related travel (ex. conferences, recruitment, presentations)."[33] Ms. Fisher further stated, "To impose a continued leave of absence would impose an undue hardship for the University and cannot be accommodated."[34] Attached to Ms. Fisher's email were emails from Dr. James Johnston, Defendant's Provost and Vice President for Academic Affairs, and Dr. Sam Watson, the Dean of the Political Science Department as well as a Professor of Political Science.[35] In his email, Dr. Watson wrote that a "continued leave of absence up to two additional semesters would impose an undue hardship for the Department of Political Science."[36] Dr. Watson stated that Plaintiff's "physical presence is required to instruct his specialty areas, advise majors and minors; and, participate in committee work that is essential to the operation of the Department, College, and University."[37] Dr. Johnston, in his email, agreed with Dr. Watson that Defendant could not accommodate Plaintiff's request for extended leave.[38] Plaintiff did not request any further disability accommodation other than the additional leave of absence.[39]

The faculty meetings to mark the start to the Fall 2019 semester were held on August 19, 2019.[40] Plaintiff was not in attendance and did not tell anyone he was not going to be in attendance until after the fact on August 21, 2019.[41] Plaintiff did not appear to teach his first classes of the semester on August 26, 2019.[42]

---

[33] *Id.* at 130–31.
[34] *Id.* at 131.
[35] *Id.* at 179–80.
[36] *Id.* at 180.
[37] *Id.*
[38] *Id.* at 179.
[39] *Id.* at 144.
[40] *Id.* at 125.
[41] *Id.* at 126.
[42] *Id.*

**B. Plaintiff's failure to return an employment contract or outside employment disclosures**

Defendant requires its faculty to sign annual faculty contracts for each academic year.[43] The contract for the 2019–2020 academic year was sent to Plaintiff on or about July 21, 2019.[44] The contract needed to be signed and returned by the start of the Fall semester on August 19, 2019.[45] Plaintiff was sent a reminder to return his faculty contract on August 8, 2019, and again on August 20, 2019.[46] Plaintiff responded to the August 20 reminder on August 21, saying that he was waiting to sign the contract until his disability accommodation plans were finalized.[47] Defendant states "the contractual relationship is a separate status that is independent from any workplace disability accommodation," and therefore, Plaintiff was still expected to return his contract on time.[48] Plaintiff never returned his faculty contract.

Defendant also has a policy requiring faculty to fill out and return an outside employment or activity disclosure form each year.[49] The reporting requirements are mandated by Texas law.[50] After traveling to Malaysia, Plaintiff refused to respond to multiple requests for his completed Outside Employment or Activity disclosure form.[51] Ms. Fisher emailed Plaintiff reminders to return the completed form for Fiscal Year 2019 and then Fiscal Year 2020 on September 21, 2018; February 25, 2019; March 7, 2019; April 15, 2019; August 29, 2019; September 12, 2019; October

---

[43] *Id.* at 144.
[44] *Id.*
[45] *Id.*
[46] *Id.* at 153–55.
[47] *Id.* at 155.
[48] *Id.* at 144.
[49] *Id.* at 143.
[50] *Id.*
[51] *Id.*

15, 2019; October 23, 2019; and January 9, 2020.[52] Plaintiff did not return any disclosure forms until January 2020.[53]

### C. Defendant cancelled Plaintiff's contract and revoked Plaintiff's tenure and termination of Plaintiff

As noted, Plaintiff did not return his faculty contract by the start of the academic year on August 19, 2019 and did not report to teach his assigned courses.[54] As such, on August 27, 2019, Defendant's President, Suzanne Shipley, wrote to Plaintiff, informing him that she took Plaintiff's failures to return the contract and report to teach his classes as Plaintiff declining Defendant's offer of employment.[55] President Shipley therefore cancelled Plaintiff's employment contract.[56] There are no similarly situated faculty comparators who remained employed with Defendant after failing to submit a contract and report to work at the start of the academic year (why is this sentence here?).[57] At this point, Plaintiff was still tenured and had a potential opportunity to return, and MSU continued the interactive process to try to accommodate Plaintiff so that he could return to work.[58]

On September 18, 2019, Dr. Watson, the Dean of the Political Science department, wrote to Plaintiff stating that he was recommending that Plaintiff's tenure be revoked for (1) "failure to submit a completed Disclosure of Outside Employment form as required by MSU policy 3.325 for Academic Year 2019 (even after multiple reminders) and for Academic Year 2020," and (2) "Neglect of professional duties for failing to meet your assigned classes for the 2019 Fall

---

[52] *Id.* at 143–44.
[53] *Id.* at 156.
[54] *Id.* at 160.
[55] *Id.*
[56] *Id.*
[57] *Id.* at 107.
[58] *Id.* at 129–31.

Semester."[59] On December 9, 2019, President Shipley wrote to Plaintiff to tell him that in examining school policies and Plaintiff's situation, she found there was good cause – the neglect of Plaintiff's professional duties – for revocation of Plaintiff's tenure and termination of Plaintiff's employment with Defendant.[60] She informed Plaintiff that, prior to termination, he had a right to a due process hearing.[61] Plaintiff requested a hearing, which was held virtually on April 3, 2020 before a Due Process Committee.[62]

On April 6, 2020, the Due Process Committee unanimously determined that there was good cause for revoking Plaintiff's tenure and terminating his employment.[63] On April 20, 2020, President Shipley formally recommended to Defendant's Board of Regents to terminate Plaintiff's tenure due to neglect of his professional duties.[64] Specifically, President Shipley listed the following grounds found by the Due Process Committee for the Board to revoke Plaintiff's tenure: (1) "[Plaintiff's] failure to return a signed contract accepting the University's offer for employment for the 2019–2020 academic year by the time of the first faculty reporting day (August 19, 2019);" (2) "[Plaintiff's] failure to report for the first day of the 2019–2020 academic year meetings (August 19, 2019) without prior notification that he would not be present;" (3) "[Plaintiff's] failure to be present on the first day of class (August 26, 2019) and failure to teach his Fall 2019 teaching assignment, in spite of being notified of his Fall 2019 teaching assignments by the Provost (January 16, 2019 and May 13, 2019);" and (4) "[Plaintiff's] failure to submit a properly completed Disclosure of Outside Employment form for Academic Years 2019 and 2020 at the time of

---

[59] *Id.* at 161.
[60] *Id.* at 164.
[61] *Id.*
[62] *Id.* at 2.
[63] *Id.* at 139.
[64] *Id.* at 108.

request."[65] In May 2020, Defendant's Board of Regents voted 8-0 to revoke Plaintiff's tenure and terminate his employment.[66] The MSU Board of Regents no longer exists because effective September 1, 2021, Defendant became part of the Texas Tech University System.[67]

Plaintiff then dually filed an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC") against Defendant, asserting race, color, and national origin discrimination claims in addition to an employment retaliation claim.[68] Later, Plaintiff filed a charge based on disability discrimination and failure to accommodate a disability with both the EEOC and the TWC.[69]

### D. Present Lawsuit

Plaintiff filed this lawsuit on June 22, 2021, and filed an Amended Complaint on August 27, 2021.[70] Plaintiff brings four causes of action: (1) Disability Discrimination/Retaliation Under the Rehabilitation Act and Chapter 21 of the Texas Labor Code against Defendant MSU; (2) Race, National Origin, and Color Discrimination under Title VII against Defendant MSU; (3) Retaliation under Title VII against Defendant MSU; and (4) Injunctive Relief under the Americans with Disabilities Act against Defendant MSU Board of Regents.[71]

Defendant filed this Motion for Summary Judgment, arguing: (i) Defendant MSU Board should be dismissed as it no longer exists and was never served;[72] (ii) the "failure to accommodate" claim fails because Plaintiff was not qualified and his requested accommodation was

---

[65] *Id.* at 140.
[66] *Id.* at 108.
[67] *Id.*
[68] Am. Compl. ¶ 25, ECF No. 11.
[69] *Id.*
[70] *See* Am. Compl., ECF No. 11.
[71] *Id.* at ¶¶ 27–46.
[72] Def.'s Br. 11, ECF No. 20.

unreasonable;[73] (iii) the "wrongful termination" and retaliation claims fail as Plaintiff was not qualified, and there was a legitimate non-discriminatory reason for his termination;[74] and (iv) the race discrimination claim stemming from not teaching summer classes fails because it was not an adverse employment action, and because Plaintiff did not teach a full course load in the preceding academic year.[75] The Court will address each of Defendant's arguments in turn.

## II.   Legal Standard

Summary judgment is proper when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine dispute as to any material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. See FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) (internal quotations and emphasis omitted).

When reviewing the evidence on a motion for summary judgment, the Court must resolve all reasonable doubts and draw all inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The Court cannot make a

---

[73] *Id.* at 12.
[74] *Id.* at 14–16.
[75] *Id.* at 16–17.

credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

### III.   Analysis

#### A.  Defendant MSU Board

Defendant argues that Defendant MSU Board of Regents should be dismissed as a defendant because the MSU Board was eliminated by statute effective September 1, 2021.[76] In his response, Plaintiff never makes any argument as to why the Board should not be dismissed as a party.[77] The parties do not dispute that, as of September 1, 2021, MSU's Board of Regents was eliminated as MSU became a "component institution of the Texas Tech University System […] under the management and control of the board of regents of the Texas Tech University System." TEX. EDUC. CODE ANN. § 109.201 (West).[78]

Further, neither the dissolved MSU Board nor the Texas Tech University System board of regents were ever served in this lawsuit.[79] Federal Rule 4(m) provides that a defendant must be served within ninety days after the filing of the complaint. FED. R. CIV. P. 4(m). If the defendant is not timely served, the court "must dismiss the action without prejudice against the defendant." *Id.* Therefore, as neither the MSU Board of Regents nor the Texas Tech University System board of regents was served in this case, and more than ninety days have passed since the Amended

---

[76] Def.'s Br. 11–12, ECF No. 20.
[77] Pl.'s Resp., ECF No. 25.
[78] *See* Def.'s Br. 12, ECF No. 20; Am. Compl. 2 n.1, ECF No. 11.
[79] Def.'s Br. 12, ECF No. 20.

Complaint was filed, the MSU Board of Regents is **DISMISSED** as a defendant, without prejudice.[80]

### B.  Disability Discrimination Based on "Failure to Accommodate"

Plaintiff alleges he was the subject of disability discrimination when Defendant MSU[81] failed to accommodate his disability, choosing to terminate him instead.[82] Defendant argues that Plaintiff fails to meet the requirements to prevail on his "failure to accommodate" claim under the Rehabilitation Act, the ADA, and Chapter 21 of the Texas Labor Code. While Plaintiff seemingly brings his claim under only the Rehabilitation Act and the Texas Labor Code, failure-to-accommodate claims are reviewed similarly under the statutes, the only material difference being that Rehabilitation Act claims have a stricter "sole cause" causation element. *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

"Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Credeur v. La. Office of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)) (internal quotations omitted). "A prima facie claim for failure to accommodate requires that: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Clark v. Charter Commc'ns, L.L.C.*, 775 F. App'x. 764, 766–67 (5th Cir. 2019); *Credeur*, 860 F.3d at 792 (quoting *Neely v. PSEG Tex., Ltd. P'ship*,

---

[80] Had Defendant MSU Board been served, Plaintiff's only claim against the Board is for injunctive relief under the ADA. *See* Am. Compl. ¶ 46, ECF No. 11. As Plaintiff's claims under the Rehabilitation Act are analyzed almost identically under the ADA, Plaintiff is not entitled to injunctive relief as the Court finds Plaintiff has not been the subject of disability discrimination. *See Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

[81] As Defendant MSU Board has been dismissed without prejudice, the usage of "Defendant" throughout the rest of the Order refers exclusively to Defendant MSU.

[82] Am. Compl. ¶ 27–32, ECF No. 11.

735 F.3d 242, 247 (5th Cir. 2013)) (internal quotations omitted); *Grant v. Harris County*, ⸺ F. App'x ⸺ 2019 WL 5618164, at *5 (5th Cir. Oct. 30, 2019). If the employer fails to reasonably accommodate an employee, but the employer can show that accommodating the employee would cause undue hardship to the employer, there is no violation. *Cortez v. Raytheon Co.*, 663 F. Supp. 2d 514, 524 (N.D. Tex. 2009). In this case, the parties do not dispute that Plaintiff has a disability and that Defendant was aware of Plaintiff's disability.

### 1. Qualified individual

"To avoid summary judgment on whether he is a qualified individual, [Plaintiff] needs to show 1) that he could perform the essential functions of the job in spite of his disability or 2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (citation omitted); *see* 42 U.S.C. § 12111(8) (A "qualified individual" is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."). Therefore, "[t]o be 'qualified' under the ADA, [Plaintiff] must be able to 'perform the essential functions' [of a tenured Associate Professor] 'with or without reasonable accommodation.'" *Credeur*, 860 F.3d at 792 (quoting 42 U.S.C. § 12111(8)). In determining whether a plaintiff is qualified, "the question is whether he was qualified at the time of his termination." *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017).

In this case, there is question as to when "the time of . . . termination" occurred. On one hand, there is August 27, 2019, when President Shipley cancelled Plaintiff's employment contract in response to Plaintiff not returning a signed contract and not reporting in person for work.[83] On

---

[83] *Id.* at 160.

the other hand, there is also May 2020, when the Board of Regents voted 8-0 to revoke Plaintiff's tenure and officially terminate his employment with Defendant.[84] This distinction is important since at the due process hearing in April 2020, Plaintiff, attending virtually, suggests that he was cleared to fly by his doctor and could physically return to work.[85] The caselaw does not resolve this specific scenario in which there are two possible points of termination, therefore, there is an open question as to whether Plaintiff was able to perform the essential functions of his job at the time of termination and, ergo, whether he was qualified. For the sake of clarity, the Court will use the May 2020 date as Plaintiff's date of termination. Therefore, at the time of termination, Plaintiff states he was able to be physically present on campus to perform his duties as an Associate Professor, and thus, he was qualified. However, the failure-to accommodate claim still fails because Defendant did not fail to provide a reasonable accommodation for a known disability.

2. <u>Reasonable accommodation for known disability</u>

The next inquiry is whether Defendant failed to provide a reasonable accommodation for Plaintiff's known disability.

a. Whether the leave requested was a "reasonable accommodation"

Plaintiff argues the additional six to twelve months of leave he requested is a reasonable accommodation.[86] Defendant contends that Plaintiff essentially requested an indefinite leave, which is not reasonable.[87]

While additional leave can sometimes be a reasonable accommodation, "courts have held that an indefinite leave does not constitute reasonable accommodation." *Cortez v. Raytheon Co.*, 663 F. Supp. 2d 514, 525 (N.D. Tex. 2009) (citing *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d

---

[84] *Id.* at 108.
[85] *Id.* at 81.
[86] Pl.'s Br. 33, ECF No. 25.
[87] Def.'s Br. 13–14, ECF No. 20.

477, 481 (5th Cir. 2000)); *see also Rogers v. International Marine Terminals*, 87 F.3d 755, 759–60 (5th Cir. 1996); *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (holding "[t]ime off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave."). Fifth Circuit courts have identified what constitutes an "indefinite leave." *See Cortez*, 663 F. Supp. 2d at 525 (holding the Plaintiff had requested an indefinite leave where the plaintiff's requested leave had "no definite return date"); *Reed*, 218 F.3d at 481 (interpreting a plaintiff's request to simply put her on leave "whenever she was unable to fly" as an indefinite leave request, and thus not a reasonable accommodation); *Moss*, 851 F.3d at 418–19 (finding plaintiff's requested leave to be indefinite where the listed return date was also the date on which plaintiff could retire, and thereby, there was no confirmation plaintiff would return on the listed date).

In this case, evidence shows that in January 2019, Plaintiff gave Defendant a two-page "Documentation of Disability" from his Malaysian doctor saying he "cannot fly," with the time frame of "at least 6 months."[88] Defendant notified Plaintiff on January 16, 2019, that he would receive Fall 2019 teaching assignments.[89] Plaintiff was notified of the specifics of his Fall 2019 teaching assignments on May 13, 2019.[90] In August 2019, just one week before the start of the fall semester, Plaintiff applied for further disability accommodations, requesting up to two more semesters of additional leave.[91] Plaintiff gave no specific return date, and he did not specify whether he would be gone just one more semester, or two.[92]

---

[88] Def.'s App. 175–76, ECF No. 21.
[89] *Id.* at 150.
[90] *Id.*
[91] *Id.* at 144.
[92] *Id.*

To show the leave requested is a reasonable accommodation, Plaintiff points to MSU's leave policy, which states in part: "[l]eaves of absence without pay *may* be granted for good cause."[93] The policy, however, is a permissive policy and does not contemplate the school granting indefinite leave. With no date that Plaintiff would definitively return from Malaysia, Plaintiff's requested additional leave was a request for an "indefinite leave" and was not a "reasonable accommodation." Therefore, Defendant was under no obligation to provide Plaintiff the additional semesters of leave.

b.   Whether Defendant engaged in an "interactive process"

Plaintiff further contends that Defendant MSU did not engage in an interactive process to determine a reasonable accommodation as required by law because, at the time the HR director Dawn Fisher emailed Plaintiff about classroom accommodations, his contract and classes had already been cancelled.[94] Defendant argues that it participated extensively in the interactive process, even after the academic year contract was cancelled.[95]

As the court in *Cortez* stated:

> To establish a claim for failure to accommodate, a plaintiff must show that: 1) she is a qualified individual with a disability; 2) the employer was aware of her disability; and 3) the employer failed to reasonably accommodate the disability. As to the third element, the ADA requires that the employer and employee engage in an interactive process to determine a reasonable accommodation. Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA. However, these courts have also held that the employer cannot be found to have violated the ADA when responsibility for the breakdown of the interactive process is traceable to the employee and not the employer.

*Cortez*, 663 F. Supp. 2d at 524 (citations omitted).

---

[93] Pl.'s App. 324, ECF No. 25-1 (emphasis added).
[94] Pl.'s Br. 32, ECF No. 25.
[95] Def.'s Reply 2, ECF No. 27.

"[T]he ADA's regulations state that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation" in order to craft a reasonable accommodation." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999) (quoting 29 C.F.R. § 1630.2(o)(3)). The EEOC's interpretive guidelines reinforce this directive, but also stress that the interactive process requires the input of the employee as well as the employer. *Id.; see also* 29 C.F.R. Pt. 1630, App. ("flexible, interactive process that involves both the employer and the qualified individual with a disability")*; Taylor v. Principal Fin. Grp, Inc.*, 93 F.3d 155, 165 (5th Cir. 1966), cert. denied, 519 U.S. 1029, 117 S. Ct. 586, 136 L.Ed.2d 515 (1996) (holding duty to launch interactive process is triggered by request for an accommodation). The need for bilateral discussion arises because "each party holds information the other does not have or cannot easily obtain." *Loulseged*, 178 F.3d at 736 (quoting *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3rdd Cir. 1999)).

There is debate among the parties as to whether the prior accommodations made by Defendant towards Plaintiff are connected to Plaintiff's final request for up to two additional semesters of leave. However, even if the Court looks at the final August 2019 accommodation request in isolation, the evidence shows that Defendant engaged in an interactive process with Plaintiff. On August 12, 2019, less than two weeks before classes were scheduled to start, Plaintiff emailed Debra Higginbotham, MSU's Director of Disability Support Services, and requested an additional six to twelve months of medical leave.[96] On August 20, 2019, Ms. Higginbotham responded to Plaintiff with an Employee Individual Accommodation Plan.[97] She told Plaintiff to sign the proposed plan and return it to her.[98] The Plan recommended that a chair be available in

---

[96] Def.'s App. 125, ECF No. 21.
[97] *Id.* at 125–26.
[98] *Id.* at 126.

Plaintiff's classroom when he was teaching; noted that ergonomic furniture may be required in his office; and imposed limits on extended travel.[99] Plaintiff responded to Ms. Higginbotham, stating that he cannot fly back to campus but gave her no date as to when he would be able to fly.[100]  On August 24, 2019, classes began and Plaintiff did not show up for his assigned classes, so on August 27, 2019, MSU President Suzanne Shipley emailed Plaintiff and cancelled his contract for the 2019–2020 academic year.[101] At this point, Plaintiff was stilled employed and tenured at MSU.[102]

Ms. Higginbotham continued conferring with Plaintiff, and on August 28, 2019, she sent Plaintiff another Employee Individual Accommodation Plan which contained the same language from the August 20 plan except it added as a possible accommodation: "leave time unless such accommodation would have undue hardship on the functioning of the department or university." Plaintiff refused to sign this plan with the language listed after "leave time."[103] Ms. Fisher reviewed the proposed plan by Ms. Higginbotham and, on August 29, 2019, emailed Plaintiff that MSU could meet the following recommendations: chair available in classroom when teaching, ergonomic furniture in the office, and limits on extended University related travel.[104] She further stated that "[t]o provide a continued leave of absence would impose an undue hardship for the University and cannot be accommodated."[105] The MSU Board of Regents did not vote to terminate Plaintiff and revoke his tenure until May 14, 2020, after all of Plaintiff's due process procedures had been exhausted.[106]

---

[99] *Id.*
[100] *Id.* at 126–27.
[101] *Id.* at 127–28.
[102] Def.'s Reply 2, ECF No. 27.
[103] Def.'s App. 130, ECF No. 21.
[104] *Id.* at 131.
[105] *Id.*
[106] Def.'s Reply 3, ECF No. 27.

Looking at the evidence, Plaintiff waited until there was one week until the start of the semester and fewer than two weeks until classes started to request additional leave. Upon receiving Plaintiff's request, Defendant immediately entered into an extensive interactive process, and it was Plaintiff who did not agree to Defendant's proposed accommodations.[107] Plaintiff, in his Response, notes that Defendant could have requested that he teach his classes online.[108] However, Defendant presented evidence that the job cannot be performed completely remotely, and importantly, Plaintiff did not bring up the possibility of online teaching when discussing possible accommodations with Defendant. Plaintiff did not propose any accommodations of his own other than the six to twelve months of additional leave, which Defendant told him it could not accommodate.[109] Therefore, Defendant followed the ADA recommendations for an interactive process, and the ultimate failure of that process does not amount to a failure-to-accommodate on the part of Defendant.

### 3. Undue Hardship

Even if an employer does fail to reasonably accommodate an employee, it is not a violation of the ADA if the employer can demonstrate that the accommodation would cause undue hardship. *Cortez*, 663 F. Supp. 2d at 524. "Undue hardship exists when an employer is required to bear more than a de minimis cost." *Antoine v. First Student, Inc.*, 713 F.3d 824, 839 (5th Cir. 2013) (citation omitted). Specifically, "undue hardship is present if the proposed accommodation would force changes in the schedules of other employees and alter the employer's otherwise neutral procedure." *Id.* (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977)).

---

[107] *Id.*
[108] Pl.'s Br. 33, ECF No. 25.
[109] Def. App. 125, 130–31, ECF No.21.

In her August 29, 2019 email to Plaintiff, HR Director Dawn Fisher wrote, "To provide a continued leave of absence would impose an undue hardship for the University and cannot be accommodated."[110] To this email, Ms. Fisher attached the email of Dr. Samuel Watson, Dean and Professor of Political Science, wherein he states, "[a] continued leave of absence up to two additional semesters would impose an undue hardship for the Department of Political Science, the Prothro-Yeager College of Humanities and Social Sciences, and the University."[111] Specifically, Dr. Watson stated that Plaintiff's absence would mean he would not be able to participate in graduate theses and written examinations.[112] Further the required graduate methods course already had been cancelled twice, causing a bottleneck in student progression through the undergraduate Political Science program.[113] Dr. Watson further stated Plaintiff's continued absence would leave the Political Science Department short-handed for recruitment and retention efforts, and advising the Political Science majors.[114] At the University level, Dr. Watson stated that the University ultimately had to cancel Plaintiff's teaching load for two consecutive semesters, causing many students to disrupt or switch their schedules at the last minute.[115] Dr. Watson stated the University did not have the professors to cover and teach some of Plaintiff's course subjects when he failed to appear for the Fall 2019 semester.[116] Having to cancel Plaintiff's courses harms the University in terms of revenue generated, student retention, and graduation rates.[117]   He concluded, "We

---

[110] *Id.* at 179.
[111] *Id.* at 180.
[112] *See id.*
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*

cannot cover all of the workload with adjuncts and overloads as the department is already strained to meet demands."[118]

Plaintiff argues Defendant fails to show that granting him additional leave would cause undue hardship.[119] Plaintiff points to the fact that no additional professors were hired to replace Plaintiff for the Fall 2019 or Spring 2020 semesters.[120] Further Plaintiff points out that there were eight courses that needed to be covered for the Fall 2019 semester, and Plaintiff was only scheduled to teach four of these courses.[121] Plaintiff finally highlights that all but three of the eight courses were covered by August 23, 2019.[122] However, Plaintiff does not deny that three courses scheduled to be taught had to be cancelled for Fall 2019, in part because Plaintiff was not there to teach the four courses he was assigned for the semester.

Overall, Plaintiff's absence forced the school to pull overloads and adjuncts to cover five of the eight scheduled courses.[123] Plaintiff's absence forced the adjunct professors to change their schedules to accommodate additional courses. Further, it altered Defendant's otherwise neutral procedure by forcing Defendant, on little notice, to, for lack of a better word, scramble in order to get as many of the scheduled courses covered as possible. And still, Defendant was forced to cancel three scheduled courses, so there were three classes of students who suddenly had their class cancelled.[124] In hindsight, Plaintiff's unexpected and unexcused absence did in fact cause MSU undue hardship. Therefore, when denying Plaintiff's requested accommodation, Defendant MSU

---

[118] *Id.*
[119] Pl.'s Br. 27–28, ECF No. 25.
[120] *Id.* at 28.
[121] *Id.*
[122] *Id.*
[123] Pl. App. 167, ECF No. 25.
[124] *Id.*

correctly ascertained that granting Plaintiff the additional requested leave would have constituted an undue hardship.

4.   Conclusion

In this case, the Court finds that physical presence on campus is an essential function of the Associate Professor position and that Plaintiff was not physically present on campus at the start of the Fall 2019 semester. Further, the leave requested by Plaintiff was not a reasonable accommodation. Additionally, Defendant engaged in an interactive process with Plaintiff to try to reach a reasonable accommodation before terminating his employment, and Defendant has demonstrated that granting Plaintiff the requested additional leave would be an undue hardship.

In conclusion, Defendant fulfilled all its statutory obligations, and the Court **GRANTS** summary judgment as to Plaintiff's claim for disability discrimination based on Defendant's failure to accommodate.

## C.  Disability Discrimination: Wrongful Termination

Plaintiff contends that he was the subject of disability discrimination, in violation of the Rehabilitation Act, because he was terminated as a direct result of his disability, his record of having a disability, and/or because Defendant regarded Plaintiff as a person with a disability.[125] Defendant contends that the claim should be dismissed as Plaintiff was not qualified and there were legitimate non-discriminatory reasons for his termination.[126]

A plaintiff may establish a claim of disability discrimination by presenting direct evidence of discrimination, or alternatively, the indirect method of proof set for Title VII actions in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), may also be utilized. *Cortez*, 663

---

[125] Am Compl. ¶ 31, ECF No. 11.
[126] Def. Br. 14, ECF No. 20.

F. Supp. 2d at 521.[127] In this case, Plaintiff has not provided direct evidence that he was terminated due to disability discrimination, so the Court assesses whether Plaintiff has provided proof to satisfy the indirect evidence framework.

Under the *McDonnell Douglas* analysis,

[A] plaintiff must first make out a *prima facie* case of discrimination by showing that: 1) he or she suffers from a disability; 2) he or she is qualified for the job; 3) he or she was subject to an adverse employment action; and 4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

*Cortez*, 663 F. Supp. 2d at 522 (emphasis in original). In this case, the parties do not contest that Plaintiff suffers from a disability. While Defendant contests that Plaintiff is qualified for the job, as discussed in the Failure to Accommodate section *supra*, the Court finds that Plaintiff is likely qualified. Plaintiff was subject to an adverse employment action when his employment was terminated. However, Plaintiff presents no evidence that he was replaced by a non-disabled person or that he was treated less favorably than non-disabled employees. In fact, Plaintiff argues that he was not replaced at all until Fall 2020, and Plaintiff makes no mention as to his replacement's disability status.[128] He further points to no non-disabled employees who kept their jobs after engaging in conduct substantially similar to Plaintiff's.[129] Therefore, Plaintiff fails to make a prima facie case of disability discrimination.

However, even if the Court found Plaintiff made a prima facie case, Defendant provided legitimate, nondiscriminatory reasons for Plaintiff's termination. "After the employee makes out a prima facie case, the employer must articulate a 'legitimate, nondiscriminatory reason' for the

---

[127] *Cortez* involves a disability discrimination claim under the ADA, but as noted earlier, ADA and Rehabilitation Act claims are analyzed almost identically. The only difference lies in their respective causation requirements. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).
[128] Pl. Br. 17, ECF No. 25.
[129] *See generally* Pl. Br., ECF No. 25; Am. Compl., ECF No. 11.

adverse employment action; if it does so, the burden shifts back to the employee." *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 527 (5th Cir. 2022). At that point, in response to a motion for summary judgment, "an employee must present 'substantial evidence' that the employer's legitimate, nondiscriminatory reason for termination is pretextual." *Id.* (quoting *Delaval v. PTech Drilling Tubulars*, LLC, 824 F.3d 476, 480 (5th Cir. 2016)). "A plaintiff may meet this burden by presenting evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (citation and quotation marks omitted). However, Plaintiff brings his disability discrimination claim under the Rehabilitation Act, which provides in pertinent part that "[n]o otherwise qualified individual with a disability in the United States […] shall, *solely by reason of her or his disability*," be subjected to discrimination. 29 U.S.C. § 794(a) (emphasis added). Therefore, Plaintiff must present substantial evidence that the sole reason for his termination was his disability.

In this case, the Due Process Committee submitted to the Board of Regents four grounds on which it based its decision that Plaintiff should be terminated: (1) "[Plaintiff's] failure to return a signed contract accepting the University's offer of employment for the 2019–2020 academic year by the time of the first faculty reporting day (August 19, 2019);" (2) "[Plaintiff's] failure to report for the first day of 2019–2020 academic year meetings (August 19, 2019) without prior notification that he would not be present;" (3) "[Plaintiff's] failure to be present on the first day of class (August 26, 2019) and failure to teach his Fall 2019 teaching assignment, in spite of being notified of his Fall 2019 teaching by the Provost (January 16, 2019 and May 13, 2019);" and (4) "[Plaintiff's] failure to submit a properly completed Disclosure of Outside Employment form for Academic Years 2019 and 2020 at the time of request."[130]

---

[130] *Id.* at 140.

Plaintiff contests the first and fourth grounds advanced by the Due Process Committee.[131] He fails, however, to argue that the second and third grounds for revoking his tenure and terminating his employment were pretextual other than to say he should have been granted the requested leave. He does not contest that he did not appear for the meetings on the first day of the academic year, and that he did not appear to teach his assigned classes. He fails to point to any other faculty member who was allowed to remain a tenured professor after failing to appear for such events. Further, as noted in the Failure to Accommodate section *supra*, Defendant has sufficiently shown that granting Plaintiff his requested leave was unreasonable and would be an undue hardship. Thus, Defendant was not required to grant Plaintiff his requested leave, and Plaintiff was expected to be physically present on campus for the start of the Fall 2019 semester.

Therefore, Plaintiff has failed to show that Defendant's proffered reasons for terminating him were pretextual. He fails to show that he was terminated solely on account of his disability. The Court **GRANTS** summary judgment as to Plaintiff's wrongful termination disability discrimination claim.

### D.  Race, National Origin, and Color Discrimination under Title VII

Plaintiff contends his race, national origin, and color was a motivating factor in Defendant's decision not to allow him to teach summer classes during summer 2018.[132] To establish a prima facie claim for race, national origin, and color discrimination under Title VII, a plaintiff must show that he:

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

---

[131] Pl.'s Br. 40–41, ECF No. 25.
[132] Am Compl. ¶ 34, ECF No. 11.

*Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (citation omitted).

In this case, Plaintiff is a member of a racial minority and was arguably qualified for the position. However, Plaintiff cannot establish the third element: that he suffered an adverse employment action. "Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted). Notably, failure to grant Plaintiff desired summer teaching assignments does not rise to level of an "ultimate employment decision," so this action on the part of Defendant was not an "adverse employment action." *See Oller v. Roussel*, 609 F. App'x 770, 773 (5th Cir. 2015) ("the failure to assign [Plaintiff] to teach particular […] classes is also not an adverse employment action."). Therefore, Plaintiff cannot establish a prima facie case of race, national origin, or color discrimination. The Court **GRANTS** summary judgment as to this claim.

### E.  Retaliation

Plaintiff contends he was retaliated against for engaging in protected activity under Title VII and the Rehabilitation Act. Plaintiff specifically alleges Defendant retaliated against Plaintiff by failing to follow its own policy when it banned him from teaching summer classes in 2018 after he had filed a lawsuit against Defendant in 2016 for denial of a promotion based on retaliation as well as race, color, and national origin.[133] Plaintiff further alleges Defendant retaliated against him by terminating him shortly after he filed race/retaliation charges against Defendant with the EEOC in January 2019.[134] Plaintiff finally contends he was terminated in retaliation for his reporting that

---

[133] *Id.* at 40; Am. Compl. ¶ 14, ECF No. 11.
[134] Pl.'s Br. 40, ECF No. 25; Am. Compl. ¶ 14, ECF No. 11.

he was being discriminated against because of his disability and because he sought accommodation for his disability.[135]

Plaintiff first must establish a prima facie case of retaliation under Title VII and under the Retaliation Act. Both statutes require identical elements be met to show a prima facie case of retaliation: "(1) the employee engaged in [an] activity protected […] (2) the employer took [an] adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Cooper v. Dallas Police Ass'n*, 278 F. App'x 318, 320 (5th Cir. 2008) (citation omitted); *see also Calderon v. Potter*, 113 F. App'x 586, 592 (5th Cir. 2004). If the plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to provide a "legitimate, nonretaliatory reason for the adverse employment action." *Cooper v. Dallas Police Ass'n*, 278 F. App'x at 320 (quoting *Hockman v. Westward Commc'n LLC*, 407 F.3d 317, 330 (5th Cir.2004)). If the employer asserts a nonretaliatory explanation, the plaintiff's prima facie case disappears, and the plaintiff must show that the given reason is merely a pretext for retaliation. *Id.* (citation omitted). At this point, the plaintiff must "show that the adverse action would not have occurred 'but for' the protected activity." *Calderon*, 113 F. App'x at 592.

### 1. Retaliation claims under Title VII

Under Title VII, "[p]rotected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d at 385. Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

---

[135] Am. Compl. ¶ 31, ECF No. 11.

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), as revised (Jan. 25, 2019) (quoting 42 U.S.C. § 2000e-2(a)). In 2016, Plaintiff filed a lawsuit against Defendant for denial of a promotion based on race, color, and national origin.[136] Filing the lawsuit was a protected activity under Title VII. The first element of Plaintiff's prima facie case is met. Likewise, in January 2019, Plaintiff filed charges with the EEOC based on continued discrimination based on race, color, and national origin. As the lawsuit and charges were filed in opposition to unlawful conduct under Title VII, the activity was protected.

As to the second element required to prove a prima facie case, as noted in the race, national origin, and color discrimination section *supra*, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d at 385 (citation omitted). As discussed above, failure to grant Plaintiff desired summer teaching assignments does not rise to level of an "ultimate employment decision," so this action on the part of Defendant was not an "adverse employment action." Therefore, Plaintiff cannot establish a prima facie case of retaliation as to Defendant's failure to grant him summer teaching assignments for summer 2018.

As to Plaintiff's claim that he was terminated in retaliation for filing charges with the EEOC in January 2019, termination is an "ultimate employment decision," and therefore, the second element of Plaintiff's prima facie case is established.

As to the third element required to prove a prima facie case of retaliation, "[t]he employee 'does not have to show that the protected activity is the only cause of [his] termination,' however he is 'required to show that the protected activity and the adverse employment action are not

---

[136] Am. Compl. ¶ 14, ECF No. 11.

completely unrelated.'" *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 882 (5th Cir. 2020) (quoting *Mauder v. Metro. Transit Auth. of Harris Cnty, Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). "[A] plaintiff can establish causation by showing a temporal proximity between the protected activity and the adverse employment action alone." *Rodrigue v. PTS Mgmt. Grp., LLC*, 550 F. Supp. 3d 376, 403 (W.D. La. 2021) (citation omitted). "The Fifth Circuit's jurisprudence suggests that two and one-half months is the longest period that can, without more, show causation for retaliation purposes." *Id.* (citing *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020), as revised (Aug. 14, 2020)). In this case, the only evidence put forth by Plaintiff to establish the "causal link" is the temporal proximity. However, Plaintiff filed charges in January 2019 and was not terminated until May 2020, over a year later.[137] Therefore, Plaintiff cannot establish his prima facie case via temporal proximity.

Plaintiff fails to provide any evidence that his termination was at all related to his January 2019 filing of charges with the EEOC. In fact, Plaintiff admits that in January 2019, Defendant continued to accommodate his needs, granting him sick leave followed by unpaid HR leave.[138] In fact, Defendant granted him the maximum lifetime allotment of sick leave.[139] Defendant continued to assign Plaintiff classes to teach, assigning him several to teach in Fall 2019. Plaintiff fails to establish a causal link between the EEOC charges and his termination, therefore he fails to establish a prima facie case of retaliation. Therefore, the Court GRANTS summary judgment as to Plaintiff's Title VII retaliation claims.

---

[137] Am. Compl. ¶¶ 14, 24, ECF No. 11.
[138] Def.'s App. 67, ECF No. 21.
[139] *Id.* at 177.

2.   Retaliation Claims under the Rehabilitation Act

Via the Complaint, Plaintiff alleges that the protected acts triggering the allegedly retaliatory conduct were (1) Plaintiff reporting that he was being discriminated against because of his disability and (2) seeking accommodation for his disability.[140] Plaintiff does not plead that he reported being discriminated against due to his disability prior to the cancellation of his contract and his eventual termination. As to Plaintiff's act of seeking accommodation for his disability, Plaintiff requested six to twelve months of additional leave due to his disability in August 2019.[141]

Even if the Court finds that Plaintiff has established a prima facie case of unlawful termination, Defendant has articulated legitimate, non-discriminatory reasons for revoking Plaintiff's tenure and terminating his employment. As noted in the wrongful termination analysis *supra*, Plaintiff contests two of the grounds but fails to contest the other two other than to say he should have been granted the requested leave. However, as the Court discussed in the failure-to-accommodate section *supra*, Defendant was not required to grant Plaintiff the requested leave as it was unreasonable and imposed an undue hardship on Defendant. Plaintiff has thus not successfully shown that, "but for" his requesting an accommodation, he would not have had his tenure revoked and employment terminated if all other facts remained the same.

Therefore, as Plaintiff fails to show that all Defendant's reasons for revoking Plaintiff's tenure and terminating his employment were pretextual, the Court **GRANTS** summary judgment as to Plaintiff's claim of retaliation discrimination under the Rehabilitation Act**.**

---

[140] Am. Compl. ¶ 31, ECF No. 11.
[141] *See* Def.'s App. 143, ECF No. 21.

## IV.     Conclusion

As no question of law or fact exists as to any of Plaintiff's claims for relief, Defendant MSU's Motion for Summary Judgment is hereby **GRANTED** in its entirety. Final Judgment shall issue separately.

**SO ORDERED** this **24th day of October, 2022.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**